HUGH SEERY, complainant-respondent,

*v.*

WALTER S. THROOP et al., defendants-appellants.

[Decided April 28th, 1922.]

On appeal from a decree in the court of chancery advised by Vice-Chancellor Backes, who delivered the following opinion orally:

"I will give counsel my views. The thing litigated and the question to be decided is whether the executed real estate deal between the parties should be set aside for fraud.

"Seery sold his residence in Montclair to Throop for $14,000, and took a second mortgage for $2,500 in part payment, payable $500 in three months and the balance in a year. The mortgage bears date September 30th, 1920. When the $500 installment came due Throop defaulted and Seery brought this suit to foreclose. Throop, in his answer and counter-claim, sets up that he was induced to buy the property through false representation, and he prays that the transaction be rescinded— that Seery take back his property and return to Throop his money and the mortgage. The false representation pleaded, and sought to be shown by the proofs, is that Seery stated to Throop, before the contract was entered into—there was a written contract made in July, 1920—that a well three feet in diameter was on his property, when, in fact, only one-half of the well belonged to him. The dividing line between Seery's land and his neighbor, Bunting, on the south, runs through the centre of the well. There is nothing to mark the dividing line except surveyors' stakes, one at the street line, another at the extreme rear of the lot and a third near the well; none of which would attract the attention of a casual observer.

"The question is one of fact. The law is, as I understand it to be, that a misrepresentation of a material fact, acted on by, and to the injury of, the party to whom it is made, entitles him to relief in equity, to a rescission of the transaction or to compensation, depending upon the circumstances. That is, if the false representation worked harm that is not serious, and which may readily be repaired in compensation, compensation will be allowed, or if the party injured cannot restore the *status quo ante* or has waived his right to a rescission he may still be compensated if it is within the means of the court, as it is in this case, where the complainant is seeking to foreclose his mortgage.

"The burden of proof is on the defendant to establish that the false representation was made, and this he must do by a preponderance of the evidence. Has he?

"The testimony is that when Throop first went to look at the property Seery boasted of the quality of the water, saying that

it was the finest well in the neighborhood, or words to that effect, and that he was sorry to part with his property because of the well. He repeated the same sentiment when Throop went back the second time, with Mr. Simpson, the real estate agent, and no doubt gave the impression that the well belonged to him, although he at no time made the outright statement that it was on his property. That, however, was the natural inference to be drawn. On the third trip Throop said he noticed Mr. Bunting, the next-door neighbor, help himself to water, and that he asked Seery whether he was permitted that, and that Seery said, 'Yes; he was drawing it by permission.' Seery's story is somewhat different. The boasting of the well water is not denied. He says that on the day in question (the third trip) they (he and Throop) made a circuit of the lot, he pointing out the lines, and that when they got to the well the inquiry as to Bunting's right to take the water occurred, and that he said to Throop that Bunting had the right; that he pointed out the stake near the well and indicated that the line ran through the centre of the well, saying, 'There's the stake,' pointing to it, and 'Here's the well,' indicating, and that Mr. Throop said, 'All right; yes, yes,' and passed on. Seery's wife and daughter tell substantially the same story. They say they were in the yard near the well when Throop and Seery passed and that Mr. Seery pointed out the stake and the division line, showing that the line ran through the centre of the well. I do not recall that Throop denied specifically what the Seerys say took place. However, his narrative · varies decidedly from theirs. True, the testimony of the three as to this vital point is phrased in almost identical language, and it would appear that they had rehearsed the story; not to arrange what they were going to say, but how to say it—that is, how they were going to say what took place. They are plain folks, unaccustomed to court methods, and I have no doubt they talked the matter over frequently. That is not an uncommon thing. They appear to be people who fully appreciate the solemnity of an oath. Now, while the lack of spontaneity detracts, it does not discredit their testimony. I cannot, of course, cast it aside, as it is urged I

should, because of the sameness of the expression, for its source is quite as worthy as is that of the defendant. It clearly outweighs his version of the event and denial, if denial he made, that he was shown and told that the boundary line ran through the centre of the well.

"Then, in addition to the weight of the spoken testimony—three to one—there is this thing to be looked to, that is, the folly of Seery making the representations and hoping to escape discovery and the consequences. The falsity could not long be concealed and the consequences were sure to be speedy. Seery was inviting a law suit—one that would result in upsetting the entire transaction or materially reducing his mortgage, in the event of a foreclosure. I cannot conceive a sensible man making a false representation, knowing that discovery would be immediate and that he must pay the penalty. It is not in line with common experience.

"Then there are things in the testimony that lead me to suspect that Throop knew where the line ran, or that he was not much concerned whether the well was entirely within Seery's property or not. One is, that Seery had a survey of his lot showing the well divided by the party lines. This survey was attached to the title searches which were delivered to Throop or to his attorney. The searches and the survey were present and no doubt inspected at the time the title was passed. Throop was there; he had access to them; he was a lawyer. Whether he actually noticed the location of the line on the survey does not appear. He says he did not. Whether he did or not, the production of the survey at that time makes for candor on the part of Seery. He was not then concealing the location of the well.

"Another is, that the well's frame had two spouts, one toward the Bunting side, the other to the Seery side. This would attract the casual observer, let alone one about to buy, and it no doubt caught Throop's eye, and if he were interested in the well I have no question that he would have assured himself fully.

"Then, this stands out against Throop's claim that he was deceived. He learned that it was a party well on November

1st. That he admits. He made no complaint to Seery. If the false representation upon which he now relies to upset the deal had, in fact, been made, and he had been so grievously injured, as he now says he is, would he not have protested at once? Seery was a policeman in the town and was readily accessible. But Throop did nothing of the kind. Instead, he went along making substantial improvements in his home during November, December, and as late, as I recall, as last June. He was not heard to complain until about the time the first installment of his mortgage came due. His silence during all that time, after he had been so grossly deceived, as he claims to have been, inclines me to believe that it was not news to Throop when Bunting told him, on November 1st, that one-half of the well belonged to him. Throop says he delayed because he was not sure of his rights, a right to rescind or a claim to compensation. That is an answer but not an explanation. If he had felt that he had been wronged, would not the natural thing have been to call the wrong-doer to account at once, regardless of the kind of relief? He surely must have known, as a lawyer, that he had some remedy.

"I think the well played little part in the deal; by no means the extent to which it was magnified at the trial. Throop says that one of the reasons, a major reason, that induced him to buy the property was that the water of the well was drinkable and that he had anticipated using it commercially—selling it to the people in Montclair. I can hardly credit this. It is a surface well in a thickly populated community, where time and again wells had been condemned by the health authorities. It is true, the well is not as yet contaminated, as appears from analysis made, what of to-morrow? To insure that the water is potable, daily analysis is necessary; it is under constant suspicion because of the great and ever present danger. I doubt if the authorities of Montclair would permit a sale of the water. Then again, Throop is a lawyer whose time is taken up by his professional work. It seems hardly likely that he, a lawyer, would engage in the water purveying business, with all its troubles and outlays for bottles and so forth, and the precarious-

ness of the supply and the doubtful returns. I think his griev-ance in this respect has been somewhat exaggerated.

"Throop has not sustained the burden that the law casts upon him of establishing by a preponderance of the evidence the alleged false representation, and for that reason his cross-petition must be dismissed. The complainant, Seery, is entitled to a decree for the amount of his mortgage."

*Mr. Charles Jones* and *Mr. James P. Mylod,* for the respond-ent.

*Mr. George S. Hobart,* for the appellants.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion delivered by Vice-Chancellor Backes in the court of chancery.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, KATZENBACH, WHITE, HEPPENHEIMER, WILLIAMS, GARDNER, ACKERSON, VAN BUSKIRK—15.

*For reversal*—None.